## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **ADAIRA SMITH,**<br><br>**Plaintiff,**<br><br>v.<br><br>**HUMPHRYS – COVERSPORTS,** *et al.*<br><br>**Defendants.** | **CIVIL ACTION NO. 23-701** |

### MEMORANDUM OPINION

Rufe, J.                                                                July 26, 2024

Plaintiff Adaira Smith filed suit against Defendants Humphrys – CoverSports,

D.C. Humphrys Co., and John Does 1–5 and 6–10 (collectively, "DCH"), asserting claims of

employment discrimination on the basis of race, color and sex, and retaliation for engaging in

protected activity. The Complaint alleged twenty-one counts pursuant to Title VII of the Civil

Rights Act of 1964,[1] the Philadelphia Fair Practices Ordinance ("PFPO"),[2] and the Pennsylvania

Human Relations Act ("PHRA").[3] Defendants have moved for summary judgment on all claims;

in response, Plaintiff has withdrawn all claims except those of discrimination on the basis of race

under Title VII, the PFPO, and PHRA.[4] The Court considers the motion for summary judgment

as to these remaining claims.

---

[1] 42 U.S.C. § 200e *et seq.*

[2] Phila. Code §9-1101 *et seq.*

[3] 43 P.S. § 951 *et seq.*

[4] *See* Pl.'s Resp. Opp'n. [Doc. No. 21] at 1. The remaining claims are asserted as Counts I, VIII, and XV of Plaintiff's Complaint. *See* Compl. [Doc. No. 1].

I.    BACKGROUND

A.  Undisputed Facts

Plaintiff Adaira Smith is an African American woman.[5] Smith was hired by DCH, a manufacturer and wholesaler of canvas and industrial protective covers, as a Utility Employee[6] on September 20, 2021.[7] Although never clearly defined, a Utility Employee may take on many job responsibilities, including filing documents and occasional housekeeping.[8]

Upon being hired, Smith was placed on a 90-day probation period.[9] She was assigned to work with Merlen Wright, DCH's Accounts Payable Supervisor.[10] Wright was Plaintiff's direct supervisor throughout her employment, but Plaintiff would also occasionally assist Ronald Nissenbaum, the owner and CEO of DCH, and Michael Mansor, DCH's Human Resources and Payroll Manager.[11] During the probationary period, Plaintiff worked out of Wright's office and did not have her own computer.[12]

Smith received a fifty-cent wage increase on October 18, 2021 and then again on November 8, 2021.[13] Based on Wright's recommendation, Smith was placed in the permanent

---

[5] Joint Statement of Stipulated Material Facts, Ex. A [Doc. No. 19-1] ¶ 1.

[6] *Id.* ¶ 2. The parties' Joint Statement of Stipulated Material Facts state that: (1) Plaintiff testified that she was hired as a Temporary Office Assistant and (2) Plaintiff's letter provides that she was hired for the position of Utility Employee. *See id.* ¶ ¶ 20, 21.

[7] *Id.* ¶ 19.

[8] In his deposition, Michael Mansor stated that a Utility Employee is "used for what we need them for at the moment" and that Plaintiff would "often assist [Ms. Wright], sometimes help [Mr. Mansor] with filing, but also take over some of [their] housekeeping or janitorial duties as assigned." *See* Mansor Dep., Ex. E [Doc. No. 21] at 66. However, he also testified that "we move you where your skillset fits you the best" and that some utility employees are "janitorial and some production or some janitorial, some office." *See id* at 65–66.

[9] Joint Statement of Stipulated Material Facts, Ex. A [Doc. No. 19-1] ¶ 24.

[10] *Id.* ¶ ¶ 25, 26.

[11] *Id.* ¶ ¶ 3, 8, 27, 29.

[12] *Id.* ¶ ¶ 31, 32.

[13] *Id.* ¶ ¶ 35, 36.

position of Assistant to Accounts Payable.[14] On February 18, 2022, Wright and Mansor provided Plaintiff with an annual evaluation of "satisfactory/good."[15] Mansor, Wright, and Smith met to discuss the evaluation, at which point they discussed Smith expanding her job knowledge.[16] She received a 2% salary increase on March 7, 2022.[17] At the end of March 2022, Shana Brenner, DCH's Director of Sales and Marketing, spoke to Smith to see if she would be interested in a sales position.[18] Nissenbaum recommended Smith because he thought she was "sharp" and would be a good fit for sales.[19] Brenner did not hire Smith for a sales position.

During the first half of Smith's employment, she and Wright developed a friendship outside of work.[20] Plaintiff later expressed to Wright that she did not want to have a friendship due to "some uncomfortable experiences they had outside of work."[21] Plaintiff sent Wright the following text message:

> There are a lot of things you do and say only to me that is unprofessional, and it's beginning to get in the way of us doing our job. I don't want to have to ask for a meeting with Paul and Mike about [*sic*]. That's why I'm sending this text as a courtesy. I don't want to work in a hostile environment. I just want to do my job and go home, but your behavior is making that really difficult. I'd appreciate it if you would not purposely do things that make my job harder.[22]

---

[14] *Id.* ¶ 37. Although the Joint Statement of Stipulated Material Facts does not provide a date for this promotion, the February 2022 review of Ms. Smith identified her position as Assistant to Accounts Payable. *See* Mansor Dep., Ex. 2 [Doc. No. 22-6] at 72–73.

[15] Joint Statement of Stipulated Material Facts, Ex. A [Doc. No. 19-1] ¶¶ 44, 45. Defendants also produced two additional evaluations, which they contend were shown to Plaintiff, but which Plaintiff states were never provided to her. *See* Employee 60 Day Probation Evaluation, Ex. I [Doc. No. 21-3], Employee 90 Day Evaluation Accounts Payable Assistant, Ex. J [Doc. No. 21-3]; Smith Dep., Ex. B [Doc. No. 21-3] at 99–100, 104.

[16] Joint Statement of Stipulated Material Facts, Ex. A [Doc. No. 19-1] ¶ 46.

[17] *Id.* ¶ 44.

[18] *Id.* ¶ 66.

[19] *Id.* ¶ 67.

[20] *Id.* ¶ 47.

[21] *Id.* ¶ 48.

[22] *Id.* ¶ 51.

Wright responded:

> Ask for the meeting, if you feel it's necessary. I have not said anything out of line to you, nor treated you in an unprofessional manner. I would not want you to feel uncomfortable so that sounds like a good idea. Email all of us with the time and date. I will bring my records. For the first time, I will voice out my concern.[23]

On April 13, 2022, Plaintiff emailed Paul Boyle, who oversaw the Human Resources Department, and Nissenbaum, copying Mansor and Wright, to request a meeting, writing:

> Good afternoon, everyone. I am sending this email regarding to set up a meeting with all recipients on this thread. The objection [*sic*] of this meeting is to discuss the current work environment. I am happy to be a part of this wonderful team and it's a pleasure to work for the company, however, it is becoming increasingly difficult to perform my work tasks due to the lack of conduct. I trust your judgment and I am confident that you will find a satisfying solution to help maintain a healthy and professional work environment.[24]

On April 14, 2022, a meeting was held between Smith, Mansor, Boyle, and Wright.[25] Plaintiff has never alleged that Wright racially discriminated against her.[26]

On May 3, 2022, seven months after she was hired, Plaintiff was terminated from her employment during a meeting with Mansor and Boyle. Defendants contend that Plaintiff was terminated because she created tension with her supervisor, made mistakes, and was not the "right fit" for the company culture.[27]

Before terminating Smith, Defendants did not follow their own progressive discipline policy as outlined in the Employee Handbook. Defendants' progressive discipline policy follows a four-tier discipline system: a verbal warning, a written warning, a final warning, and lastly

---

[23] *Id.* ¶ 52.

[24] *Id.* ¶¶ 53, 54.

[25] *Id.* ¶¶ 57, 58.

[26] *Id.* ¶¶ 56, 60.

[27] *See* Defs.' Mot. Summ. J. [Doc. No. 19] at 2–3.

termination.[28] This procedure applies to all non-terminable offenses. Terminable offenses are defined as "certain behaviors or acts . . . likely to result in immediate termination of employment without use of progressive discipline."[29] The Handbook lists examples of terminable offenses, including possession of weapons or illegal drugs, theft of company property, and vandalism.[30] Creating tension with a supervisor, work mistakes, and "not being the right fit" were not listed as examples of "terminable offenses."[31]Although the Employee Handbook states that DCH will adhere to this policy, it also provides that "[t]he Company reserves the right to terminate employment at any time for any reason, without notice or warning, and without resort to any steps outlined in this policy."[32] Despite this, Mansor could not recall DCH ever terminating an employee for the reasons Smith was terminated without following the progressive discipline procedure.[33]

Plaintiff filed an initial Charge of Discrimination with the Pennsylvania Human Relations Commission on May 26, 2022,[34] a secondary Charge of Discrimination with the Equal Employment Opportunity Commission on July 25, 2022,[35] and a third Charge of Discrimination on August 26, 2022 with the Philadelphia Commission on Human Relations.[36] The EEOC issued a Right to Sue Notice on December 14, 2022, and Smith timely filed suit.[37]

---

[28] Employee Handbook, Ex. D [Doc. No. 21-3] at 23–24.

[29] *Id.* at 22–23.

[30] *Id.*

[31] *See id.*

[32] *Id* at 24.

[33] Mansor Dep., Ex. E [Doc. No. 21-3] at 128.

[34] Joint Statement of Stipulated Material Facts, Ex. A [Doc. No. 19-1] ¶ 73.

[35] *Id.* ¶ 74.

[36] *Id.* ¶ 75.

[37] Compl., Ex. A [Doc. No. 1].

### B. Disputed Facts

The parties present conflicting accounts about Mansor's behavior. Plaintiff's testimony, which Defendants largely contest, describes multiple incidents of racial discrimination. Plaintiff testified that Mansor frequently asked her questions about her hair, *e.g.*, "Is your hair real?"; "Why do Black women pat their hair?"; "Why are there lace fronts?"; and "Why are there edges?"[38]

Smith testified in her deposition that Mansor would require her to perform janitorial duties, even though this was not a part of her job description.[39] In addition, Plaintiff recounted witnessing Mansor "slam the door" in the face of Black warehouse workers and pretend that he didn't understand workers who were from Africa.[40] Plaintiff further testified that after she requested a new office chair to replace her broken one, Mansor told Wright that Smith wouldn't get a new one because she "wasn't going to be there long."[41] According to Plaintiff, Mansor told Wright that he did not want to promote Smith to a permanent Accounts Payable position because he did not want to hire another girl like Plaintiff's predecessor, who was also a Black woman.[42]

## II.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.[43] A fact is "material" if resolving the dispute over the fact "might affect the outcome of the

---

[38] *See* Smith Dep., Ex. B [Doc. No. 21-3] at 83–95.

[39] *See id.* at 283–85.

[40] *See id.* at 259–61.

[41] *See id.* at 117–118.

[42] *See id.* at 257.

[43] *See* Fed. R. Civ. P. 56(a).

suit under the governing [substantive] law."[44] A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[45]

A court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor.[46] Further, a court may not weigh the evidence or make credibility determinations.[47] Nevertheless, the party opposing summary judgment must support each essential element of the opposition with concrete evidence in the record.[48] "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."[49]

## III.   DISCUSSION

In the absence of direct evidence of discrimination, the Court applies the burden-shifting framework established in *McDonnell Douglas Corp. v. Green* for racial discrimination claims.[50] First, the employee must establish a *prima facie* case of discrimination to demonstrate that: (1) Plaintiff is a member of a protected class; (2) Plaintiff suffered an adverse employment action; (3) Plaintiff was qualified for her position; and (4) Plaintiff was terminated under circumstances that can support an inference of intentional discrimination.[51]

---

[44] *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

[45] *Id.*

[46] *Hugh v. Butler Cnty. Fam. YMCA*, 418 F.3d 265, 267 (3d Cir. 2005) (citation omitted).

[47] *Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998).

[48] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

[49] *Anderson*, 477 U.S. at 249–50 (citations omitted).

[50] *See, e.g., Martinez v. UPMC Susquehanna*, 986 F.3d 261, 265 (3d Cir. 2021) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973)). The legal framework for employment discrimination under Title VII, the PFPO, and the PHRA are the same. *See Kelly v. Drexel Univ.,* 94 F.3d 102, 105 (3d Cir. 1996).

[51] *See Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003).

Next, "the burden shifts to the employer to 'articulate some legitimate, nondiscriminatory reason'" for the adverse action against the employee.[52] Lastly, the employee must then demonstrate that the proffered reason was merely a pretext for unlawful discrimination.[53] The burden-shifting framework is not meant to be rigid and mechanical, but instead is an "orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination."[54]

The first three elements of Plaintiff's *prima facie* case are uncontested for purposes of summary judgment: Smith is a member of a protected class, she was qualified for the position, and her termination constituted an adverse employment action. Defendants argue that Plaintiff has failed to establish the fourth element by failing to identify people outside of her protected class who were treated more favorably.[55] However, the requirements of a *prima facie* case are flexible and the "fourth element must be relaxed in certain circumstances . . . ."[56] Plaintiff is "not required to plead comparator evidence," but instead can support an inference of discrimination in "a number of ways, including . . . evidence of similar racial discrimination of other employees, or direct evidence of discrimination from statements or actions by her supervisors suggesting racial animus."[57]

Plaintiff has provided sufficient evidence to support an inference that Defendants racially discriminated against her. Plaintiff testified that Mansor frequently asked her about her hair,

---

[52] *Id.*

[53] *See McDonnell Douglas,* 411 U.S. at 802–04; *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143 (2000) (citations omitted).

[54] *Weldon v. Kraft, Inc.,* 896 F.2d 793, 798 (3d Cir. 1990) (internal quotation marks and citation omitted).

[55] Defs.' Mot. Summ. J. [Doc. No. 19] at 2.

[56] *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 357 (3d Cir. 1999) (citation omitted).

[57] *Golod v. Bank of Am. Corp.*, 403 F. App'x. 699, 702 n.2 (3d Cir. 2010) (citation omitted).

including numerous questions about whether her hair was "real," "why do Black women pat their hair?," "why are there lace fronts?," and  "why are there edges?"[58] While such questions, viewed in isolation, might be construed as "[s]tray remarks . . . unrelated to the decision process,"[59] Plaintiff also testified that she observed Mansor engaging in derogatory behavior toward Black employees by slamming his door in their faces and mocking Black employees from Africa by pretending he could not understand them.[60] Lastly, in her deposition, Smith testified that Mansor required her to do janitorial duties, which were not part of her job description.[61] Viewing the evidence in the light most favorable to the non-moving party, Smith has presented sufficient evidence to support an inference of racial discrimination and establish her *prima facie* case.

For their part, Defendants have articulated a non-discriminatory reason for Smith's termination—namely, that she was terminated because "of the tension she created with her supervisor" and "her continued mistakes and not being the right fit."[62] Therefore, the burden shifts back to the Plaintiff to cast doubt on Defendants' proffered reasons for the termination. Plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably (1) "disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."[63] Plaintiff has met her burden.

---

[58] *See* Smith Dep., Ex. B [Doc. No. 21-3] at 83–95.

[59] *Ezold v. Wolf, Block, Schorr and Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992).

[60] *See* Smith Dep., Ex. B [Doc. No. 21-3] at 259–61, 271.

[61] *See id.* at 283–84.

[62] *See* Defs.' Mot. Summ. J. [Doc. No. 19] at 2–3; *see also* Smith Dep., Ex. B [Doc. No. 21-3] at 208–09; Mansor Dep., Ex. E [Doc. No. 21-3] at 121–22.

[63] *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994) (citations omitted).

The Third Circuit has stated that "low evaluation scores may be a pretext for discrimination, especially where, as here, an employer uses subjective criteria such as 'attitude' and 'teamwork' to rate its employees."[64] Here, instead of negative reviews for Plaintiff's supposed mistakes, Defendants gave Plaintiff a positive performance review, multiple raises, and even recommended her for a job in sales.[65] A rational factfinder could conclude that these facts undercut Defendants' explanation that Plaintiff was fired, in part, for "continued mistakes."

Defendants also assert that Plaintiff was fired because she was not the right fit for the company. However, there is record evidence to suggest that Defendants had never previously terminated an employee for "not being the right fit" without following their own progressive discipline procedure.[66] Defendants' progressive discipline policy outlines a four-tier system: a verbal warning, a written warning, a final warning, and then finally termination.[67] This system applies to all employees, unless they committed what was considered a "terminable offense," in which case the employee would be let go of immediately. Creating tension with a supervisor and workplace fit were not listed as "terminable offenses,"[68] and Mansor testified in deposition that, throughout his time as Human Resources Manager, he could not recall any other employee except Plaintiff being fired for "not being the right fit" without first following the progressive discipline procedure.[69] Coupling this evidence with Plaintiff's testimony that Mansor treated

---

[64] *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006) (citations omitted).

[65] *See* Smith Dep., Ex. B [Doc. No. 21-3] at 99–106, 137–138, 141, 226–27; February 18, 2022 Performance Review, Ex. 7 [Doc. No. 22-11].

[66] Mansor Dep., Ex. E [Doc. No. 21-3] at 124.

[67] Employee Handbook, Ex. D [Doc. No. 21-3] at 23–24.

[68] *See id.*

[69] Mansor Dep., Ex. E [Doc. No. 21-3] at 124.

other Black employees in a discriminatory manner, a factfinder could reasonably conclude that she was terminated for an invidious discriminatory reason.

"Employment discrimination cases center around a single question: why did the employer take an adverse employment action against plaintiff? Because this is clearly a factual question, summary judgment is in fact rarely appropriate in this type of case."[70] Here, there are numerous factual disputes on material issues and credibility determinations that belong in the hands of a jury. Therefore, summary judgment must be denied.

### IV.   CONCLUSION

For the reasons stated above, Defendants' Motion will be denied. An order will be entered.

---

[70] *Marzano v. Comput. Sci. Corp. Inc.*, 91 F.3d 497, 509 (3d Cir. 1996) (quotation marks and internal citation omitted).